IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

UNITED STATES OF AMERICA     PLAINTIFF

v.     Case No. 2:21-CR-20009-PKH-1

BIANCA ROSA GARCIA ROMERO     DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Defendant, Bianca Rosa Garcia Romero ("Ms. Romero"), filed a Motion to Suppress and Brief in Support on May 10, 2021. (ECF No. 40). The Government filed its Response on May 24, 2021. (ECF No. 41). The matter was referred to the undersigned for report and recommendation on May 25, 2021. (ECF No. 42). A hearing on the motion was held on June 10, 2021. (ECF No. 47).

Following a thorough review of the motion, response, the briefs, dash camera video, exhibits, and witness testimony in this case, and for the reasons stated below, it is recommended that the Motion to Suppress (ECF No. 40) be DENIED.

### I. Background

On January 18, 2021, Ms. Romero and her passenger, Cecilia Benavides Gallegos ("Ms. Gallegos"), were traveling eastbound in a silver Hyundai Elantra on Interstate 40 in Crawford County, Arkansas, within the Western District of Arkansas. At approximately 8:10 a.m., Arkansas State Trooper Joshua Elmore ("Trooper Elmore") initiated a traffic stop of Ms. Romero for following his patrol vehicle too closely. Dash camera ("dash cam") video from Trooper Elmore's patrol vehicle documents the stop, subsequent search, and ultimate arrest of Ms. Romero and Ms. Gallegos. (ECF No. 47-1, Joint Exhibit 1).

1

Based on the dash cam video, Trooper Elmore was driving at 60 miles per hour before he slowed to 45 miles per hour and briefly pulled to the shoulder of the highway. Ms. Romero's vehicle then passed Trooper Elmore's patrol vehicle, and Trooper Elmore initiated the traffic stop for following too closely.

Trooper Elmore asked for Ms. Romero's driver's license and if she had any weapons on her. Ms. Romero replied, "No." He requested that she come with him to his patrol vehicle, and Ms. Romero did so. Inside his patrol vehicle, Trooper Elmore ran an NCIC check on the Hyundai Elantra and asked Ms. Romero about the ownership of the vehicle, the destination of her journey, the name of the passenger and how they knew each other, how long they would be staying at their destination, and the name of the person they were traveling to visit. Ms. Romero told Trooper Elmore that the vehicle belonged to the passenger, whom she called "CeCe, Cecilia," and stated that she did not know the passenger's last name. She told Trooper Elmore that she used to be Ms. Gallegos' supervisor, they had known each other for years, had a close relationship, and that Ms. Gallegos knew Ms. Romero's family.

Ms. Romero stated they had a four-day weekend and were traveling from Bakersfield, California to Tennessee to see Ms. Romero's aunt, who had come from Mexico. She stated their destination was Cleveland, Tennessee, and they were going to stay with her Aunt Maria. Trooper Elmore commented that it was a quick roundtrip, and Ms. Romero responded that they had to return to work. While speaking to Ms. Romero, Trooper Elmore determined that the vehicle was not registered to either Ms. Romero or Ms. Gallegos based on the NCIC return.

Trooper Elmore then approached the vehicle to speak to Ms. Gallegos. He asked her about their destination, the purpose of travel, and how she knew Ms. Romero. Ms. Gallegos told Trooper

Elmore they were going to Huntsville, Tennessee, that Ms. Romero was her cousin, and they were going to see Ms. Gallegos' Aunt Marta.

Next, Trooper Elmore returned to his patrol vehicle and asked Ms. Romero if she had any weapons in the car. Ms. Romero responded, "No, you want to go ahead and check it?" Trooper Elmore asked, "You don't have any weapons at all?" Ms. Romero responded, "Not at all." Then, Trooper Elmore asked, "You okay with me searching it?" and Ms. Romero responded, "Yeah, yeah." After confirming that she did not have anything on her and that Trooper Elmore could check her, Ms. Romero exited the patrol vehicle. Trooper Elmore commented to himself about the conflicting stories.

Trooper Elmore then searched Ms. Romero's person pursuant to her consent and instructed her to stand about 30 feet in front her vehicle. Next, he instructed Ms. Gallegos to exit the vehicle and asked her if she had anything on her. Ms. Gallegos replied, "No," and Trooper Elmore instructed her to stand next to Ms. Romero. He then proceeded to search the front passenger side and the back passenger side of the vehicle.

Moving to the back of the vehicle, Trooper Elmore attempted but failed to open the trunk. Seeing this, Ms. Romero spontaneously told him how to open it from the inside, and Trooper Elmore went to the driver's side to open the trunk from the inside. He then searched the front driver's side and the back driver's side of the vehicle before proceeding to the trunk.

While searching the trunk, Trooper Elmore observed a large speaker box that was not wired to the vehicle and the right speaker had only four screws holding it in place.[1] Trooper Elmore picked up the speaker box and gently shook it. He then retrieved a power drill from his patrol vehicle and proceeded to remove the right speaker using the drill. Upon removing the right

---

[1] The speaker box has two speakers. As shown in Government Exhibit 3, the left speaker had all eight screws holding it in place.

speaker, Trooper Elmore discovered what he later reported to be five vacuum sealed packages of cocaine.[2] He arrested Ms. Romero and Ms. Gallegos and they were transported to Crawford County jail.

On January 25, 2021, a Criminal Complaint was filed charging Ms. Romero with aiding and abetting in the possession with intent to distribute cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. (ECF No. 1). An initial appearance was held by Zoom videoconference on January 28, 2021, and Ms. Romero waived the issues of probable cause and detention. (ECF No. 10). Counsel was appointed to represent Ms. Romero (ECF No. 12), and an Order of Detention was entered (ECF No. 13). On March 10, 2021, Ms. Romero filed a Motion to Reconsider Detention Status (ECF No. 18), and a detention hearing was held by Zoom videoconference on March 16, 2021 (ECF No. 21). The Court authorized Ms. Romero's release upon execution of a $5,000 Signature Bond with terms and conditions of release. (ECF Nos. 22, 23); however, Ms. Romero remained in custody because of pending state court charges stemming from the same offense conduct.

An Indictment was issued on March 30, 2021, charging Ms. Romero and Ms. Gallegos with one count of conspiracy to distribute cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and § 846, and one count of aiding and abetting possession with intent to distribute more than five hundred (500) grams of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(ii) and 18 U.S.C. § 2. (ECF No. 24). Ms. Romero was arraigned on April 2, 2021, at which time she entered a not guilty plea to the Indictment. (ECF No. 32). A jury trial was scheduled for April 26, 2021 (ECF No. 33), and a

---

[2] Government Exhibit 4 depicts the packages inside the speaker box after the right speaker had been removed.

continuance was granted on April 16, 2021, resetting the jury trial for June 28, 2021 (ECF No. 39). Another continuance was granted on June 2, 2021 (ECF No. 44), with the case to be re-set upon entry of the Court's ruling on the Motion to Suppress.

Ms. Romero's pending Motion to Suppress (ECF No. 40) seeks the suppression of all evidence obtained from the search. She argues the search was unconstitutional because it exceeded the scope of her consent to search the vehicle for weapons and when Trooper Elmore disassembled the speaker box found in the trunk of the vehicle where he discovered the packages of cocaine inside. In her motion and brief, Ms. Romero likens Trooper Elmore's removal of the right speaker from the speaker box as a destructive search requiring her explicit consent. (*Id*. at 4-7). At the hearing, defense counsel argued that while the search may not have been destructive, use of a tool (the drill to remove the screws) exceeded Ms. Romero's consent to search the vehicle. Thus, Ms. Romero contends, the "fruit of the poisonous tree" doctrine precludes the introduction of all evidence seized from the search.

In its Response (ECF No. 41), the United States asserts that the scope of consent is what the typical person would have understood by the exchange between the officer and the suspect, and the suspect's subjective understanding of her statements concerning consent do not control. Further, the United States contends that even assuming *in arguendo* that the consent to search was limited to a search for weapons, the removal of the right speaker from the speaker box, and the discovery of the drugs inside the speaker box, was lawful as the Trooper had probable cause to believe that Ms. Romero and Ms. Gallegos were transporting drugs or other illegal items and that the items were concealed in the speaker box.

A hearing on the motion was conducted on June 10, 2021. (ECF No. 47). The State Trooper's dash cam video was received in evidence as Joint Exhibit 1. (ECF No. 47-1). The dash

cam video consists of three video files of the same duration depicting a forward view, a view of the back interior of the police vehicle, and another forward view that later changes to a view of the front interior of the police vehicle. The Government called Trooper Elmore to testify at the motion hearing, and Government's Exhibits 1-4 were received in evidence without objection. Government Exhibits 1 and 2, respectively, depict the distances between Bakersfield, CA and Cleveland, TN (32 hours; 2,177 miles), and between Cleveland, TN and Huntsville, TN (2 hours, 11 minutes; 134.3 miles). Government Exhibit 3 is a photograph of the speaker box with the right speaker having been loosened. Government Exhibit 4 is a photograph of the packages found inside the speaker box.

## II. Discussion

The Fourth Amendment of the United States Constitution protects against unreasonable searches and seizures. U.S. Const. Amend. IV. Though a search conducted without a warrant is *per se* unreasonable under the Fourth and Fourteenth Amendments of the Constitution, it is well settled that a search conducted pursuant to a specifically established exception, such as consent, does not necessarily violate the Constitution. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). The Eighth Circuit explains that "[t]he boundaries of a consensual automobile search are confined to the scope of the consent." *United States v. Siwek*, 453 F.3d 1079, 1084-85 (8th Cir. 2006). The scope of consent "is what 'the typical reasonable person [would] have understood by the exchange between the officer and the suspect.'" *Id.* at 1085. "'The scope of a search is generally defined by its expressed object,' and therefore an officer may reasonably interpret a suspect's unqualified consent to search a vehicle for drugs to include consent to, inter alia: 'search containers within that car which might bear drugs,' probe underneath the vehicle, and open compartments that appear to be false, or puncture such compartments in a minimally intrusive

manner." *United States v. Ferrer-Montoya*, 483 F.3d 565, 568 (8th Cir. 2007) (citing *Florida v. Jimeno*, 500 U.S. 248, 251 (1991); *United States v. Siwek*, 453 F.3d 1079, 1082-83, 1085 (8th Cir. 2006); *United States v. Barragan*, 379 F.3d 524, 530 (8th Cir. 2004); and *United States v. Martel-Martines*, 988 F.2d 855, 858 n.3 (8th Cir. 1993)) (cleaned up).

The Eighth Circuit has found that a state trooper's search of a false compartment in a vehicle is within the scope of consent given by a defendant when a defendant places no qualifications or limitations upon his consent to the trooper's search of the vehicle for drugs. *United States v. Ferrer-Montoya*, 483 F.3d at 567-69. In *Ferrer-Montoya*, a state trooper initiated a traffic stop for speeding and found that the defendant had no title to the vehicle or proof of insurance. *Id.* at 567. The defendant admitted he had entered the country illegally, offered a vague and inconsistent description of his travel plans, and finally gave the state trooper both verbal and written consent to search the vehicle. While searching the vehicle, the state trooper noticed scarring on two screws that held a console panel in place. When he removed the screws and lifted the panel, he noticed the frame had been cut to create a hidden compartment and discovered two packages containing methamphetamine in that compartment. *Id.*

Noting several factors from the stop, the court in *Ferrer-Montoya* ultimately found that the state trooper's search of the false compartment fell within the scope of the defendant's general consent to search the vehicle for drugs. *Id.* at 568-69. First, the defendant placed no qualifications or limitations upon his consent to search and at no time did the defendant object or suggest that he wished to withdraw his consent to search. *Id*. Next, the state trooper believed, based upon his experience and training in drug interdiction, that the scarred screws indicated the presence of a hidden compartment where one could hide drugs. *Id*. Finally, the state trooper did not damage

the vehicle when he opened the compartment in a minimally intrusive manner by removing the screws. *Id.*

In the present case, Trooper Elmore's search of the speaker box found in the trunk of the vehicle was within the scope of consent given by Ms. Romero as she placed no qualifications or limitations upon her consent to Trooper Elmore's search of the vehicle. Trooper Elmore asked Ms. Romero, "You okay with me searching it [the vehicle]?" Ms. Romero replied, "Yeah, yeah." Ms. Romero did not place any qualifications or limitations upon her consent to Trooper Elmore's search of the vehicle. Trooper Elmore proceeded to search the front passenger side then the back passenger side of the vehicle. When Trooper Elmore moved around to the trunk of the vehicle and could not open it, Ms. Romero spontaneously told Trooper Elmore how to open the trunk from inside the vehicle. Trooper Elmore then went to the driver's side, opened the door, and released the trunk latch. He searched the front and back driver's side of the vehicle and then moved around to the trunk. At no point did Ms. Romero withdraw her consent to search the trunk of the vehicle; to the contrary, she told Trooper Elmore how to open it. Even assuming *in arguendo* that the scope of consent was limited to places in which a weapon (and not drugs) might be found, the trunk of the vehicle, and the speaker box found in the trunk, certainly fall within that scope.

During his search of the vehicle's trunk, Trooper Elmore found the speaker box. He noticed that it was not wired to the vehicle and that screws were missing from the right speaker. When he picked up the speaker box and gently shook it, he could feel objects moving around inside. Based upon his training and experience, he believed that drugs might be concealed in the speaker box. At no time did Ms. Romero object or suggest that she wished to withdraw her consent to search while Trooper Elmore picked up and examined the speaker box, returned to his patrol vehicle to retrieve a drill, and proceeded to remove the four screws securing the right speaker to

the box. Further, Trooper Elmore did not damage the vehicle, or the speaker box, when he removed the four screws to loosen the right speaker so he could see inside the speaker box.

Under an objective reasonableness standard, Trooper Elmore reasonably interpreted Ms. Romero's unqualified consent to search the vehicle to include consent to search for weapons or drugs within containers and to open compartments that appeared to be false. Ms. Romero placed no qualifications or limitations on the search when she answered, "Yeah, yeah," to Trooper Elmore's question, "You okay with me searching it?" When Trooper Elmore attempted to open the trunk, Ms. Romero told him how to open it from the inside. Thus, Ms. Romero clearly indicated that her consent to search included the trunk. After Trooper Elmore found and examined the speaker box in the trunk, and then retrieved a drill from his patrol vehicle and proceeded to open the speaker box, Ms. Romero still did not object or suggest that she wished to withdraw her consent to search. Therefore, the search of the speaker box found in the vehicle's trunk did not exceed the scope of Ms. Romero's unqualified consent to search the vehicle.

Further, even assuming *in arguendo* that the search exceeded the scope of Ms. Romero's consent to search "the surfaces of the car's interior" (ECF No. 40 at 5) for weapons, the totality of the circumstances gave Trooper Elmore probable cause to believe that Ms. Romero and Ms. Gallegos were engaged in criminal activity and evidence of that activity was concealed in the speaker box. "Observations made by an officer during a consensual search of a vehicle may provide the officer with probable cause to expand the scope of the search under the automobile exception." *United States v. Murillo-Salgado*, 854 F.3d 407, 417-18 (8th Cir. 2017) (citing *United States v. Guevara*, 731 F.3d 824 (8th Cir. 2013)). "Probable cause exists 'when, considering all the circumstances, there is a fair probability that the evidence of a crime will be found in a

9

particular place.'" *United States v. Lopez-Zuniga*, 909 F.3d 906, 909 (8th Cir. 2018) (citing *United States v. Faulkner*, 826 F.3d 1139, 1144 (8th Cir. 2016)).

In *Murillo-Salgado*, the Eighth Circuit found that observations made by the troopers during a consensual search of a vehicle provided the troopers with probable cause to expand the scope of the search under the automobile exception. 854 F.3d at 417-18 (noting that a warrantless search of a vehicle for contraband is permissible when an officer has probable cause to justify the search (citing *United States v. Ross*, 456 U.S. 798, 825 (1982))). In that case, the troopers initiated a traffic stop, asked permissible questions about travel route and purpose, and began a search of the vehicle pursuant to the driver's voluntary consent. *Murillo-Salgado*, 854 F.3d at 411-13. The troopers observed 'implausibilities [sic] and inconsistencies' in response to routine questions. *Id.* at 416. In addition, the troopers noticed the smell of fresh paint inside the vehicle, observed fresh paint on the air compressor tank, and detected non-factory modifications on the air tank. *Id.* at 418. The defendants gave inconsistent statements regarding their journey and the nature of the rental agreement associated with the vehicle they were driving. There was visible evidence of non-factory alterations to the air compressor and tank. Considering these facts observed by the troopers during the consensual search, the court found the troopers had probable cause to expand the scope of that search. *Id.* at 418.

Here, on the morning of January 18, 2021, Trooper Elmore was traveling eastbound on Interstate 40 when he observed Ms. Romero following him too closely in the right lane. He observed that she would not pass him even as he slowed to approximately 50 miles per hour. He then slowed to 45 miles per hour and pulled over to the shoulder of the highway before Ms. Romero eventually passed him, at which point Trooper Elmore initiated the traffic stop. At the hearing, he testified that following too closely and failing to pass were "pre-stop indicators" that, alone, did

not arouse his suspicions of criminal activity beyond the traffic violation for which he initiated the stop.

During the traffic stop, Trooper Elmore asked both Ms. Romero and Ms. Gallegos separately about their travel route, the purpose of their journey, the nature of their relationship, and the registration of the vehicle. Trooper Elmore questioned the plausibility of a 4,200-mile roundtrip in just four days to visit an aunt. He noted their inconsistent statements regarding whom they were traveling to visit (Ms. Romero's Aunt Maria versus Ms. Gallegos' Aunt Marta) and their destination (Cleveland, Tennessee versus Huntsville, Tennessee). Their statements about the nature of their relationship were also inconsistent—Ms. Romero described them as close work colleagues (but she did not know Ms. Gallegos' last name), while Ms. Gallegos stated they were cousins. Trooper Elmore also learned that the vehicle was not registered to either Ms. Romero or Ms. Gallegos, despite Ms. Romero stating that it was registered to Ms. Gallegos. These inconsistent statements caused Trooper Elmore to become suspicious that Ms. Romero and Ms. Gallegos were engaged in criminal activity and that evidence of that criminal activity was likely to be found in the vehicle.

Inside the trunk, Trooper Elmore noticed a speaker box that was not connected to the vehicle and screws were missing from the right speaker. Because he believed the speaker box would be unusable in this state, its presence in the trunk was suspicious to Trooper Elmore. Moreover, based on his training and experience, the missing screws alerted Trooper Elmore to the possible presence of a contraband being hidden inside. At the hearing, he testified that he could feel items moving around inside the speaker box when he picked it up. At this point, given the implausible stated purpose of Ms. Romero's journey, the inconsistent statements of both Ms. Romero and Ms. Gallegos, and the apparently unusable speaker box that seemed to contain

something inside it, Trooper Elmore had a reasonable suspicion that evidence of criminal activity was concealed inside the speaker box, and he proceeded to detach the right speaker in a minimally intrusive manner by using an electric drill to remove the four screws. Confirming his suspicion, Trooper Elmore found five vacuum sealed packages of cocaine inside the speaker box.

Thus, even if Trooper Elmore expanded the scope of Ms. Romero's consent to search the vehicle by detaching the right speaker from the speaker box to look inside, it was reasonable for Trooper Elmore to believe that he would find evidence of criminal activity inside the speaker box. Accordingly, probable cause supported Trooper Elmore's search for drugs inside the vehicle and inside the speaker box.

### III. Conclusion

For the reasons and upon the authorities discussed above, it is recommended that Ms. Romero's Motion to Suppress (ECF No. 40) be **DENIED**.

**The parties have fourteen (14) days from receipt of this Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely written objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 28th day of June 2021.

/s/ Mark E. Ford
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE